**Joseph VICARI as Administrator of the Estate of Barbara Vicari, Deceased, Appellant**

v.

**Joseph R. SPIEGEL, M.D., Pramila Rani Anne, M.D., and Jefferson Radiation Oncology Associates, Appellees.**

Superior Court of Pennsylvania.

Argued Aug. 28, 2007.
Filed Oct. 18, 2007.

---

Stephen E. Raynes, Philadelphia, for appellant.

Deborah M. Knight, Philadelphia, for Spiegel, appellee.

Paul E. Peel, Plymouth Meeting, for Anne and Jefferson Hospital, appellees.

BEFORE: STEVENS, BENDER and KELLY, JJ.

OPINION BY BENDER, J.:

¶ 1 Plaintiff Joseph Vicari, administrator of the estate of his wife, Barbara Vicari (collectively, "Plaintiff"), appeals from the order dated October 26, 2006, and docketed on October 30, 2006, which denied Plaintiff's motion to remove the nonsuit that had been entered in favor of the defendants, Joseph R. Spiegel, M.D., Pramila Rani Anne, M.D., and Jefferson Radiation Oncology Associates.[1] Unfortunately, Mrs. Vicari was diagnosed with tongue cancer in February of 2001, for which she received surgery and radiation treatment from the defendants; however, the cancer metastasized, resulting in her death on April 1, 2002. The basis of the asserted liability in this case was the defendants' failure to inform Mrs. Vicari about the option of follow-up chemotherapy treatment with a medical oncologist for her tongue cancer to counter the risk of metastases. Finding that the nonsuit was entered improperly against Plaintiff, we reverse and remand for a new trial.

¶ 2 Plaintiff filed a complaint on December 13, 2002. In the complaint, Plaintiff averred that Mrs. Vicari was under the care of her family physicians, Central Bucks Family Practice, since July of 1997. Complaint, 12/13/02, at ¶ 40. At that time, Mrs. Vicari had also been under the care of a nutritionist (also referred to as an alternative medicine practitioner at trial), Cynthia Earney and her practice, Unique Health. *See id.* at ¶ 41. In June of 1998, Mrs. Vicari was seen at Central Bucks Family Practice for chronic otitis media of her left ear. *Id.* at ¶ 42. Dr. Robin examined Mrs. Vicari on October 1, 1998, for complaints of left ear pain that radiated to her jaw and neck, and, several months later, Mrs. Vicari was examined at Central Bucks on June 28, 1999, by either Dr. Robin and/or Dr. Treiman for complaints of swollen glands. *Id.* at ¶¶ 43–46.

¶ 3 On June 30, 1999, Mrs. Vicari told Ms. Earney about sores on the left side of her tongue. In the meantime, Mrs. Vicari was evaluated by Dr. Kazmierczak, a dentist, in July and September of 1999. *Id.* at ¶ 48. In January of 2000, Ms. Earney advised Mrs. Vicari that the condition on her tongue was a fungal infection, and recommended that it be treated with "Canplex." *Id.* at ¶¶ 50–51.

¶ 4 On February 7, 2000, Mrs. Vicari was evaluated by another dentist, Dr. Kashoff, who performed a comprehensive oral exam the following month. *Id.* at ¶¶ 52–53. Apparently, Mrs. Vicari was also still treating with Ms. Earney and, in March of 2000, Mrs. Vicari reported to Ms. Earney that the left side of her tongue was still flaring up and was sore and swollen. *Id.* at ¶ 54. In June of 2000, Mrs. Vicari reported to Ms. Earney that her tongue sensitivity and swelling had worsened and her tongue appeared "white." *Id.* at ¶ 55.

¶ 5 Mrs. Vicari returned to see Dr. Kashoff in October of 2000, and she saw Dr. Robin again in December of 2000, continuing to complain of chronic left ear pain. *Id.* at ¶¶ 57–58. Mrs. Vicari presented to Dr. Robin again on January, 4, 2001, with an "erythematous, flat, exquisitely painful lesion the size of a quarter" on the left side of her tongue. *Id.* at ¶ 61. Finally, Dr. Robin referred Mrs. Vicari to an oral surgeon. *Id.* at ¶ 62.

¶ 6 Louis Huy, D.M.D., conducted a biopsy of Mrs. Vicari's tongue on February

---

1. Other defendants, who are not parties in this appeal, included Jefferson Health System, Inc., David R. Kashoff, D.D.S., Stephen T. Kazmierczak, D.M.D., Sarah E. Robin, D.O., Central Bucks Family Practice, Philip R. Treiman, M.D., Cynthia Earney, and Unique Health Approach. These defendants were either dismissed or entered into settlements with Plaintiff.

12, 2001, resulting in a diagnosis of squamous cell cancer, which had, by that time, invaded the underlying muscle of the tongue. *Id.* at ¶¶ 63–65. Mrs. Vicari was referred to Dr. Spiegel, an otolaryngologist and ENT surgeon, who recommended a combination of surgery and radiation treatment. N.T., 5/2/06, at 67. Dr. Spiegel performed the surgery, namely a partial glossectomy[2] and a left modified radical neck dissection wherein he removed 34 lymph nodes. Complaint at ¶¶ 66–68.

¶ 7 The surgical pathology report revealed that the tumor that was removed had a positive margin, meaning that cancer cells were visible to the edge of the removed tumor, giving rise to the inference that cancer cells remained in the body where the tumor was removed (the tongue and oral pharynx). N.T., 5/1/06, at 90. The pathology report also revealed perineural invasion of the tumor, and one of the lymph nodes that had been removed was positive for squamous cell carcinoma. *Id.* at 91; Complaint at ¶ 69. Plaintiff contended that these three factors, a positive margin, perineural invasion, and a positive lymph node, indicated that Mrs. Vicari was at a higher risk of tumor recurrence and metastasis. N.T., 5/1/06, at 91–92.

¶ 8 Following surgery, Dr. Spiegel referred Mrs. Vicari to Dr. Anne, a radiation oncologist, for a course of radiation therapy, which she received in May and June of 2001. *Id.* at 4–5; Complaint at ¶¶ 70–71. However, neither Dr. Spiegel nor Dr. Anne discussed follow-up chemotherapy treatment with a medical oncologist to guard against possible recurrence and metastases. Following completion of the radiation treatment, Mrs. Vicari saw Dr. Spiegel and Dr. Anne for standard postoperative appointments, but continued having severe pain. N.T., 5/1/06, at 73. Nevertheless, Dr. Spiegel and Dr. Anne expressed their belief that Mrs. Vicari's cancer had been cured. *Id.*

¶ 9 Mrs. Vicari's pain persisted to the extent that, in October of 2001, she was unable to lie down in bed. *Id.* at 74. Still, the defendants "thought she was cured[,]" and attributed her symptoms to possible post-radiation side effects like nerve damage, but did not express a concern that her cancer may have metastasized. *Id.* at 74–75. Dr. Spiegel recommended that she see a neurologist, which she did in December of 2001. *Id.* at 75.

¶ 10 Nevertheless, Mrs. Vicari's severe pain persisted and she sought a second opinion at a different hospital. *Id.* at 76. A chest x-ray, which was performed on January 21, 2002, revealed lung tumors. *Id.* at 76; Complaint at ¶ 72. A subsequent CT scan and MRI revealed several lesions in Mrs. Vicari's thoracic cavity, including the lungs and in the pericardial area. *Id.* at 76; Complaint at ¶¶ 74–76. Another CT scan in March of 2002 revealed that the metastasized tumors were progressing rapidly, and that the tumors had invaded Mrs. Vicari's bone, spleen, and kidney. Complaint at ¶¶ 77–79. Mrs. Vicari died on April 1, 2002. *Id.* at ¶ 80; N.T., 5/2/06, at 78.

¶ 11 A jury trial in this case commenced on May 1, 2006, with Dr. Spiegel, Dr. Anne, and Jefferson Radiation Oncology Associates as the remaining defendants.[3]

**2.** "Glossectomy" is defined as "[s]urgical removal of all or part of the tongue." *See* U.S. National Institutes of Health, National Cancer Institute, *available at* www.cancer.gov.

**3.** As Plaintiff's counsel explained, the claim against Dr. Kashoff, premised on Plaintiff's claim that he delayed diagnosis of Mrs. Vicari's tongue cancer, was settled, and the claims against the remaining defendants pertained to their failure to inform Mrs. Vicari about follow-up chemotherapy and their failure to refer her to a medical oncologist for this purpose. *See* N.T. Trial, 5/1/06, at 15.

Plaintiff presented two experts at trial, Ronald H. Blum, M.D., and Peter Berman, M.D. Dr. Blum is a medical oncologist and Dr. Berman is an otolaryngologist and ENT surgeon.[4] N.T., 5/1/06, at 61; N.T., 5/2/06, at 16. Additionally, in its case-in-chief, Plaintiff presented certain deposition testimony from Dr. Spiegel, and testimony from Mr. Vicari and the Vicari's two children. Plaintiff rested his case prior to the lunch recess on May 2, 2006.

¶ 12 Upon returning from the lunch recess, Plaintiff's counsel, Stephen E. Raynes, Esq., motioned to re-open his case, indicating that he could not "remember whether or not Dr. Berman used the words to a reasonable degree of medical certainty" in rendering his opinion. N.T., 5/2/06, at 101–102. Attorney Raynes indicated that Dr. Berman was, at that time, returning to the court room. *Id.* at 102. Alternatively, Attorney Raynes argued that the totality of Dr. Berman's opinion was rendered to the requisite degree of certainty, even though Dr. Berman may not have used the "magic words" of "reasonable degree of medical certainty." *See id.* at 102–103.

¶ 13 Frederic Goldfein, Esq., attorney for Dr. Spiegel, and Bart Tuttle, Esq., attorney for Dr. Anne, objected to Plaintiff's motion to re-open his case to allow Dr. Berman to testify that his opinion was rendered to a reasonable degree of medical certainty. *Id.* at 104. Attorney Goldfein also argued that the totality of Dr. Berman's opinion fell short of establishing the basis for his opinion. *Id.* at 105–106. Following argument at sidebar, the court denied Plaintiff's motion to re-open. *Id.* at 111. Immediately thereafter, Attorney

Goldfein presented an oral motion for compulsory nonsuit, in which he further argued that Dr. Blum, the other expert, was not qualified to opine on the care rendered by Dr. Spiegel and Dr. Anne, because he was neither a board-certified ENT surgeon, nor was he licensed to administer radiation therapy. *Id.* at 112–113. Additionally, Attorney Goldfein argued that Plaintiff did not establish that the standard of care in 2001 involved referral to a medical oncologist for chemotherapy treatment, and that the jury would be left to speculate about the harm caused by Dr. Kashoff and other practitioners who initially failed to identify the tongue cancer, on the one hand, and the harm caused by the defendants herein. *Id.* at 114–118.

¶ 14 Following additional argument, the court granted the defendants' motion for nonsuit, and subsequently entered this order on the docket on May 10, 2006. On May 11, 2006, Plaintiff filed a post trial motion seeking to remove the nonsuit. The court filed an order dated October 26, 2006, and docketed on October 30, 2006, which denied Plaintiff's motion to remove nonsuit and entered judgment in favor of defendants.[5] Plaintiff filed a timely notice of appeal on November 13, 2006, followed by a timely statement of matters complained of on appeal, as ordered by the court, pursuant to Pa.R.A.P. 1925(b).

¶ 15 Plaintiff presents the following Statement of Questions Involved in his brief:

1. Whether the trial court abused its discretion in refusing to permit [Plaintiff] to re-open his case to al-

---

4. ENT surgeon refers to "ear, nose, and throat" surgeon, also referred to as a "head and neck" surgeon in the record.

5. Where a court has entered a judgment of compulsory nonsuit, the appeal lies not from

the entry of the judgment itself, but rather from the court's refusal to remove it. *Smith v. Grab,* 705 A.2d 894, 896 n. 1 (Pa.Super.1997) (citation omitted).

low his expert Peter Berman, M.D., to state that his opinions were held to a reasonable degree of medical certainty.

. . .

2. Whether the trial court erred or abused its discretion in striking Dr. Berman's testimony, and consequently granting non-suit, on the basis that he did not use the words "to a reasonable degree of medical certainty," where the substance of his testimony established that his opinions *were* rendered to a reasonable degree of medical certainty, and Pennsylvania law does not require the use of "magic words," and where defendants waived this issue.

. . .

3. Whether the trial court erred or abused its discretion in granting non-suit on the apparent basis that [Plaintiff's] expert Ronald Blum, M.D., was not qualified to give testimony as to the standard of care under the Medical Care Availability and Reduction of Error (MCARE) Act, where Dr. Blum was qualified to provide such testimony because of his specialization in an area with the same standard of care for the specific care at issue, and defendants waived the issue.

. . .

4. Whether the trial court erred or abused its discretion in granting non-suit, having apparently stricken Dr. Blum's testimony on the standard of care, where Dr. Blum's testimony on causation, combined with Dr. Spiegel's own admissions and

[Plaintiff's] evidence in his case in chief, were sufficient to establish a claim for professional negligence and ordinary negligence.

Plaintiff's brief at 3.[6]

¶ 16 Beginning with the second issue, we conclude initially that the trial court erred by striking the testimony of Plaintiff's expert in otolaryngology and ENT surgery, Dr. Berman, and subsequently granting nonsuit in defendants' favor on the basis that he did not render his opinion to the requisite "reasonable degree of medical certainty." "In reviewing the entry of a nonsuit, our standard of review is well-established: we reverse only if, after giving appellant the benefit of all reasonable inferences of fact, we find that the factfinder could not reasonably conclude that the essential elements of the cause of action were established." *Bethea v. Philadelphia AFL–CIO Hosp. Ass'n*, 871 A.2d 223, 225 (Pa.Super.2005). Indeed, "[w]hen a nonsuit is entered, the lack of evidence to sustain the action must be so clear that it admits no room for fair and reasonable disagreement. . . . The fact-finder, however, cannot be permitted to reach a decision on the basis of speculation or conjecture." *Smith*, 705 A.2d at 898–99 (citations omitted). As explained below, even though Dr. Berman may not have used the exact phrase, "reasonable degree of medical certainty," his opinion, in its totality, was rendered to that requisite degree of certainty.

¶ 17 We first review the essential elements of a medical malpractice claim:

In order to establish a *prima facie* case of malpractice, the plaintiff must

---

6. We note that each issue was contained in Plaintiff's Rule 1925(b) statement, although the only issue the trial court addressed in its opinion filed pursuant to Pa.R.A.P. 1925(a) pertained to Plaintiff's complaint that the court erred by granting nonsuit on the basis that Dr. Berman failed to use the words "reasonable degree of medical certainty" in rendering his opinion at trial, as further described *infra*.

establish (1) a duty owed by the physician to the patient (2) a breach of duty from the physician to the patient (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient, and (4) damages suffered by the patient that were a direct result of that harm.

*Mitzelfelt v. Kamrin*, 526 Pa. 54, 584 A.2d 888, 891 (1990). Moreover, "where the circumstances surrounding the malpractice claim are beyond the knowledge of the average layperson, as in the instant case[,]" *Vogelsberger v. Magee–Womens Hosp. of UPMC Health Sys.*, 903 A.2d 540, 563 n. 11 (Pa.Super.2006), the "plaintiff is also required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered[,]" *Mitzelfelt*, 584 A.2d at 892.

¶ 18 Additionally, a "medical opinion need only demonstrate, with a reasonable degree of medical certainty, that a defendant's conduct increased the risk of the harm actually sustained, and the jury then must decide whether that conduct was a substantial factor in bringing about the harm." *Smith*, 705 A.2d at 899 (quoting *Jones v. Montefiore Hosp.*, 494 Pa. 410, 431 A.2d 920, 923 (1981)). *See also Billman v. Saylor*, 761 A.2d 1208, 1212 (Pa.Super.2000) ("[W]here the plaintiff is unable to show to a reasonable degree of medical certainty that the physician's actions/omissions caused the resulting harm, but is able to show to a reasonable degree of medical certainty that the physician's actions/omissions increased the risk of harm,

the question of whether the conduct caused the ultimate injury should be submitted to the jury"); *Montgomery v. South Philadelphia Med. Group, Inc.*, 441 Pa.Super. 146, 656 A.2d 1385, 1392 (1995) ("[W]here the plaintiff has alleged that the defendant's conduct increased the risk of injury, the defendant will not be relieved from liability merely because the plaintiff's medical expert was unable to say with certainty that the defendant's act caused the harm. So long as reasonable minds can conclude that the defendant's conduct was a substantial factor in causing the harm, the issue of causation may go to the jury upon a less than normal threshold of proof.").

¶ 19 In determining whether the expert's opinion is rendered to the requisite degree of certainty, we examine the expert's testimony in its entirety. *Carrozza v. Greenbaum*, 866 A.2d 369, 379 (Pa.Super.2004) (citation omitted). "That an expert may have used less definite language does not render his entire opinion speculative if at some time during his testimony he expressed his opinion with reasonable certainty." *Id.* (citation omitted). Accordingly, an expert's opinion will not be deemed deficient merely because he or she failed to expressly use the specific words, "reasonable degree of medical certainty." *See Commonwealth v. Spotz*, 562 Pa. 498, 756 A.2d 1139 (2000) (indicating that "[i]n this jurisdiction, experts are not required to use 'magic words'" but, rather, "this Court must look to the substance of [the expert's] testimony to determine whether his opinions were based on a reasonable degree of medical certainty rather than upon mere speculation").[7] Nevertheless,

---

7. It appears that the trial court was under the misapprehension that the specific words, "reasonable degree of medical certainty," were necessary. Specifically, the trial court stated that "Plaintiff attempts to rely upon the notion that 'no magic words' are necessary.... [P]laintiff is mistaken." Trial Court Opinion (T.C.O.), 4/19/07, at 3. The court

"[a]n expert fails this standard of certainty if he testifies 'that the alleged cause 'possibly', or 'could have' led to the result, that it 'could very properly account' for the result, or even that it was 'very highly probable' that it caused the result." *Eaddy v. Hamaty*, 694 A.2d 639, 642 (Pa.Super.1997) (citation omitted). *See also Corrado v. Thomas Jefferson Univ. Hosp.*, 790 A.2d 1022, 1031 (Pa.Super.2001) (finding expert opinion that defendant "more likely than not" deviated from standard of care insufficiently certain).

¶ 20 In the instant case, Dr. Berman's testimony, viewed in its entirety, established his opinion, to a reasonable degree of medical certainty, that the defendants' failure to refer Mrs. Vicari for chemotherapy increased the risk of harm, specifically, the risk of metastasis. Thus, the case should have proceeded to the jury, making the entry of a compulsory nonsuit at the close of Plaintiff's case improper. Although Dr. Berman admitted that the delayed diagnosis by Dr. Kashoff and Ms. Earney increased the risk of harm to Mrs. Vicari and that, by the time she presented to the defendants, her cancer was advanced, he also rendered an opinion that the risk of harm was increased by the defendants' failure to refer her to a medical oncologist for chemotherapy following her surgery, especially given the presence of several risk factors for metastasis.

¶ 21 Specifically, Dr. Berman explained that the pathology report following Mrs. Vicari's surgery with Dr. Spiegel revealed that the tumor had a "positive margin," meaning that the tumor was not completely resected, and that cancer cells remained, resulting in a "very great" potential for recurrence and metastasis. N.T., 5/2/06, at 38–39. Additionally, the fact that one of the lymph nodes that had been surgically removed was also positive for cancer cells indicated a "high propensity" of the tumor to metastasize further. *Id.* at 39. Finally, Dr. Berman noted that there was "perineural invasion" of the tumor, meaning that "the tumor has involved nerve structures in and around the area it's been resected from." *Id.* at 40.

¶ 22 Given these circumstances, in addition to the location and size of the tumor, Dr. Berman opined that Mrs. Vicari should have "absolutely" been referred to a medical oncologist for chemotherapy treatment. *Id.* at 39, 42. He stated that these factors, *i.e.*, the positive margins, the positive lymph node, and the perineural invasion, required that Mrs. Vicari be offered chemotherapy and informed of its benefits and risks. *Id.* at 51–52. Because she was not so advised, Dr. Berman stated that she was "deprived of the significant opportunity for treatment which significantly increased the risk to her of local regional occurrence of metastasis too [sic] which she ultimately succumbed." *Id.* at 52. Dr. Berman also stated that "there was a deviation from the standard of care not offering Mrs. Vicari chemotherapy since she had an extensive later stage cancer with positive margins, and a positive lymph node of what was perineural invasion[,]" and that "the failure to evaluate and send Mrs. Vicari for chemotherapy created harm to her, and may have prevented her from having disease free interval and large survival life." *Id.* at 36.

¶ 23 Counsel for Dr. Spiegel emphasizes that the last statement, wherein Dr. Berman used the word "may," reveals that his opinion was not rendered to the requisite degree of medical certainty. We disagree.

further stated: "The words 'reasonable degree of medical certainty' were painfully absent." *Id.* at 2.

As summarized above, Dr. Berman's testimony, taken in its entirety, reveals a steadfast opinion, based on facts of record including the risk factors for metastases, that Mrs. Vicari should have "absolutely" been referred to a medical oncologist and that the failure to do so "deprived" her of a "significant opportunity for treatment which significantly increased" the risk of harm. *See id.* at 39, 42, 51–52. Of course, it is impossible to determine if, had Mrs. Vicari undergone chemotherapy, she would have had a "disease free interval and large survival life," *id.* at 36, thereby explaining Dr. Berman's use of the word "may" in this context. However, according to cases such as *Smith, Billman,* and *Montgomery, supra,* all that Plaintiff needs to establish is that the defendants' conduct increased the risk of harm. Moreover, our focus is, again, on the totality of Dr. Berman's testimony, which reveals an opinion rendered to the requisite degree of certainty such that the grant of nonsuit was improper on this basis and the case should have been allowed to proceed to the jury.[8,9]

¶ 24 In his third issue, Plaintiff argues that the trial court erred by concluding that Plaintiff's other expert, Dr. Blum, a medical oncologist, was not qualified, under the Medical Care Availability and Reduction of Error Act (MCARE Act), 40 P.S. §§ 1303.101–1303.1115, to opine on the standard of care applicable to the defendants, an otolaryngologist/ENT surgeon and a radiation oncologist.[10] We conclude initially that Dr. Blum was qualified to render his opinion under the MCARE Act.

¶ 25 "Whether a witness has been properly qualified to give expert witness testimony is vested in the discretion of the trial court. It is well settled in Pennsylvania that the standard for qualification of an expert witness is a liberal one." *Wexler v. Hecht,* 847 A.2d 95, 98 (Pa.Super.2004) (citations and quotation marks omitted). "Thus, we may reverse

---

8. The trial court, citing to page 39 of the trial transcript, concluded that Dr. Berman's use of "the words 'potentially,' 'high propensity' and 'again re-indicating a prior propensity for further spread[,]' " revealed that his opinion was not sufficiently certain. T.C.O. at 4. However, when these phrases are viewed in the context of Dr. Berman's testimony, the record reveals that he was describing the "propensity" and "potential" of *metastases* in light of the risk factors present post-surgically in this case. The terms were in no way related to the degree of certainty to which he held his opinion.

9. The fact that the trial court, in the instant case, refused to allow Plaintiff to re-open his case to allow Dr. Berman to state that his opinion was rendered to a "reasonable degree of medical certainty" is inconsequential, given our present determination that Dr. Berman's opinion, viewed in its entirety, was, nonetheless, expressed with the requisite degree of reasonable certainty. Accordingly, we need not address Plaintiff's first issue, in which he argues that the trial court abused its discretion by refusing to allow him to re-open his case.

10. We acknowledge Plaintiff's argument that the defendants waived any objection to Dr. Blum's qualifications because they did not lodge an objection until the day after his testimony, during the argument on their motion for nonsuit. Indeed, any objections to Dr. Blum's qualifications could have been raised, at the earliest, in a pretrial motion *in limine* following receipt of his curriculum vitae and expert report or, at the very least, following voir dire on his qualifications. On the other hand, the defendants argue that Plaintiff waived his waiver argument because he failed to raise it during argument on the motion for nonsuit. Although we do not condone the defendants' untimely objection to Dr. Blum's qualifications and find Plaintiff's waiver argument persuasive, because we have determined that Dr. Blum was indeed qualified to render his opinion, we decline to engage in an analysis of the parties' competing waiver arguments.

the trial court's decision regarding admission of expert testimony only if we find an abuse of discretion or error of law. Furthermore, because the issue regarding an expert's qualifications under the MCARE Act involves statutory interpretation, our review is plenary." *Jacobs v. Chatwani*, 922 A.2d 950, 956 (Pa.Super.2007) (citations omitted).

¶ 26 The MCARE Act provides in pertinent part as follows:

### § 1303.512. Expert qualifications

**(a) General rule.**—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

**(b) Medical testimony.**—An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

> (1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

> (2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

**(c) Standard of care.**—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

> (1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

> (2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

> (3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

. . .

**(e) Otherwise adequate training, experience and knowledge.**—A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

40 P.S. § 1303.512(a)-(c), (e).

¶ 27 It appears that the trial court granted a nonsuit in the instant case while under the misapprehension that the MCARE Act requires the proffered expert to be board certified in the same specialty as the defendant physician. *See* N.T., 5/2/06, at 131.[11] However, although it is

---

**11.** Although the trial court did not address this issue in its opinion filed pursuant to Pa. R.A.P. 1925(a), it appears that the trial court

accepted defense counsel's argument that "the M–Care act [sic] requires that the defendant who is board certified in his or her field

preferable that the expert be in the same specialty as the defendant, *see Smith v. Paoli Mem'l Hosp.*, 885 A.2d 1012, 1020 (Pa.Super.2005), that is not what the law requires in every case. Rather, "[t]he 'same subspecialty' ideal contained in § 1303.512(c)(2) includes an express caveat, reflecting the Legislature's decision to afford the trial court discretion to admit testimony from a doctor with expertise in another specialty that 'has a similar standard of care *for the specific care at issue.*'" *Id.* (quoting *Herbert v. Parkview Hosp.*, 854 A.2d 1285 (Pa.Super.2004)). The specific care at issue in the instant case is whether the defendants should have referred Mrs. Vicari to a medical oncologist for discussion of chemotherapy as a treatment option, given the risk factors for metastases present following her surgery. Dr. Blum was qualified to opine on the specific care at issue in this case.

¶ 28 Dr. Blum is a board-certified medical oncologist who has treated cancer patients, including patients with head and neck cancer, for more than thirty years. N.T., 5/1/06, at 61–63. He is the director of cancer centers and programs for the Beth Israel Cancer Center in New York, has had numerous academic and hospital appointments, has special expertise in clinical studies, and has sat on various editorial boards including the editorial board of the Journal of Clinical Oncology. *Id.* at 61, 63–64. He has been involved in developing new cancer drugs and treatments, "particularly combining treatments with using [sic] surgery, radiation and chemotherapy." *Id.* at 65. He has been involved heavily with the American Society of Clinical Oncology, a professional organization, where he served on various com-

mittees including the publications committee and scientific review committee. *Id.* at 65–66. Dr. Blum serves on the advisory boards of a number of cancer centers and is chairperson of the cancer committee "constituted under our accreditation of the American College of Surgeons." *Id.* at 67. He has had extensive involvement on "tumor boards," which consist of a panel of physicians from various oncology sub-specialties, including surgeons, radiation oncologists, and medical oncologists, who discuss and make recommendations regarding the treatment of individual cancer patients. *Id.* at 68. In his role as a medical oncologist, he evaluates and understands operative and pathology reports like the ones in the instant case, which he employs in his treatment of patients. *Id.* at 82–83, 89.

¶ 29 Although Dr. Blum is not an otolaryngologist/ENT surgeon or radiation oncologist, his opinion was limited to when persons practicing in those oncology-related specialties, with regard to the relevant time-period in this case, should refer a patient to a medical oncologist for chemotherapy treatment. For example, he provided testimony on the mechanics of metastases of an oral cancer, *see id.* at 81, and he rendered an opinion, based on the facts in this case and the scientific literature at the time, that, given the risk factors for metastases that were present in this case, Mrs. Vicari should have been referred to a medical oncologist, *see id.* at 92–93, 115–116. He noted that "[i]t wasn't [the defendants'] place to offer chemotherapy" but, rather, "[i]t was their place to refer them to a medical oncologist" for "discussion, recommendation and the bene-

have someone to offer standard of care against them [sic] who is board certified in the same field" and that this was a "fatal flaw" in Plaintiff's case. N.T., 5/2/06, at 112. The trial court noted this argument as its

basis for striking Dr. Blum's testimony, indicating that the "problem" was that he was not board certified in the same specialty as either defendant. *Id.* 131.

fits of chemotherapy [sic] in this particular situation." *Id.* at 93. He also discussed the medical literature which he claimed supported his opinion that the standard of care in 2001 required the defendants to tell Mrs. Vicari that she was at high risk for metastases, required that they discuss the option of chemotherapy, and required that they refer her to a medical oncologist for this purpose. *Id.* at 116, 126, 177, 186. Dr. Blum opined, to a reasonable degree of medical certainty, that by failing to do so, the defendants deviated from the standard of care, which increased the risk of harm to Mrs. Vicari. *Id.* at 116–117.

¶ 30 Notably, Dr. Blum did not opine on Dr. Spiegel's performance of the surgery itself or on Dr. Anne's implementation of radiation therapy. Rather, his opinion was limited to elucidate for the jury when it is appropriate for persons in these other oncology-related specialties to refer a patient to a medical oncologist for chemotherapy treatment, an opinion of which he was well-qualified to render.[12]

¶ 31 In his fourth issue, Plaintiff argues in the alternative that, even in the absence of the testimony of his experts, Drs. Berman and Blum, defendant Dr. Spiegel's testimony was enough, standing alone, to avoid entry of nonsuit against Plaintiff. Since we have determined that the trial court erred by striking the testimony of Plaintiffs' experts and granting the nonsuit, it is not necessary to conduct an examination of Dr. Spiegel's testimony to determine if it was in itself sufficient to submit this case to the jury.

¶ 32 For the foregoing reasons, we reverse the trial court's order refusing to remove the nonsuit and remand this case for a new trial.

¶ 33 Order refusing to remove nonsuit reversed. Case remanded for a new trial. Jurisdiction relinquished.

---

**12.** We note that a significant portion of the cross-examination of Dr. Blum and argument in support of the nonsuit involved the defendants' contention that the medical literature did not support Dr. Blum's opinion that the standard of care in 2001 involved referral for chemotherapy treatment, whereas Dr. Blum's direct testimony and Plaintiff's argument obviously supported the opposite contention. This illustrates that the case involved the two schools of thought doctrine, which is a defense in a malpractice case but not a proper basis in itself upon which to grant nonsuit. *See, e.g.,* N.T., 5/2/06, at 118–119 (defense counsel arguing that this case is "akin" to a "two schools of thought case").