J-A09043-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| TAMMY G. SIMBECK AND GEORGE C. SIMBECK | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : | |
| v. | : : : | |
| GREGORY J. ROSCOE, M.D. | : : | No. 798 WDA 2024 |

Appeal from the Judgment Entered August 20, 2024
In the Court of Common Pleas of Clearfield County Civil Division at
No(s): 2019-0650-CD

BEFORE:     KUNSELMAN, J., NICHOLS, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED: August 6, 2025**

Plaintiffs Tammy G. Simbeck ("Simbeck") and George C. Simbeck[1] ("George") appeal from the judgment entered in favor of defendant Gregory J. Roscoe, M.D. ("Dr. Roscoe"), following the trial court's grant of Dr. Roscoe's motion for nonsuit.  We affirm.

In March 2017, Dr. Roscoe, an ear, nose, and throat specialist, performed surgery on Simbeck to remove "her right submandibular saliva gland, which is one of the three saliva glands."  Trial Court Opinion, 6/10/24, at 1-2.  In the subsequent six weeks, Simbeck "regularly reported to the emergency room of the hospital[,] where she saw Dr. Roscoe.  She complained

---

[1] Tammy's husband, George C. Simbeck, raised grounds for relief in nature of loss of consortium.  As those claims relied on the validity of Tammy Simbeck's claims, we do not separately address them.  For ease of discussion, we refer to Simbeck as the singular plaintiff in this matter.

[about] pain, a swollen and tender neck, numbness in her tongue, difficulty in swallowing, lack of taste, etc." *Id*. at 2. Dr. Roscoe "performed a minor surgical procedure[,] removing a small mass from [Simbeck's] esophogaus." *Id*.

Simbeck also treated with Seungwon Kim, M.D. ("Dr. Kim"). He reviewed a post-surgery CT scan, which "showed multiple hemoclips in the right submandibular region[,] with some . . . located deep to the mylohyoid muscle." N.T., 8/29/23, at 114. Dr. Kim had some "concerns that the numbness of the tongue may be due to the presence of a hemoclip on the lingual nerve." *Id*. By way of background, Simbeck's expert witness, John Bogdasarian, M.D. ("Expert Witness"), described a hemoclip at trial as follows:

> [T]he hemoclip is essentially like a staple almost that it clamps down on something. Primarily used to stop bleeding. But if it's put on a nerve, it will essentially cut off the blood supply and kill the nerve. So anything that it doesn't belong on, it can compress and cause injury to. . . .

N.T., 8/29/23, at 148. *See also id*. at 110-11 (Dr. Roscoe testifying a hemoclip is "like a staple" that "clip[s] over the blood vessel [to] close[] off the blood vessel").

On April 22, 2019, Simbeck commenced this medical malpractice action by filing a writ of summons.[2] In her subsequent complaint, Simbeck alleged Dr. Roscoe's negligence "was a substantial factor in bringing about an

---

[2] Simbeck also named two additional defendants, including the hospital where the surgery occurred; both have "been dismissed." Simbeck's Brief at 8.

increased harm to" her. Complaint, 4/22/19, at ¶ 32. The complaint then set forth twelve subparagraphs, each containing a separate allegation of a negligent act. Only the first two are relevant to the present dispute. First, the complaint averred that Dr. Roscoe "negligently . . . inserted an excessive amount of hemoclips deep into the mylohyoid muscle and penetrating her lingual nerve[.]" *Id*. at ¶ 32(a). Second, the complaint asserted that "negligently inserting said excessive amount of hemoclips excessively deep into [Simbeck]'s mylohyoid muscle . . . cause[d] them to penetrate her lingual nerve[.]" *Id*. at ¶ 32(b). The remaining subparagraphs raised allegations that were not presented to the jury.[3]

Simbeck's complaint attached an expert report from Expert Witness, setting forth his opinion that Dr. Roscoe "deviated from accepted standards of medical and surgical care in his treatment of . . . Simbeck." Expert Report, 8/11/21, at 3, Exhibit A to Complaint. This report made no mention of hemoclips. Dr. Roscoe filed a motion for summary judgment, pointing this out. Expert Witness then submitted a supplemental report, acknowledging the lack of discussion of hemoclips. Nevertheless, Expert Witness reasoned:

> [Dr. Roscoe's contention] misses the entire point of this lawsuit, *i.e.* that an injury to the lingual nerve occurred when it should not have, and was the result of substandard performance of the right submandibular salivary gland excision. **The detail in [Dr. Roscoe's post-operation] report is not sufficient to**

---

[3] These allegations concerned Dr. Roscoe's post-surgical care, failure to attempt more conservative approaches, and failure to obtain informed consent.

> ***determine the exact means by which the lingual nerve was injured. Hemoclips***, ordinarily utilized to control bleeding, ***were only one of several possible mechanisms for the lingual nerve injury.*** . . .

Expert Report, 3/3/22, Exhibit B to Dr. Roscoe's Motion to Preclude Claims of Medical Problems Not Supported by Expert Testimony, 8/28/23 (emphases added).

This matter proceeded to a jury trial in August 2023. Simbeck called Expert Witness as an expert in the field of otolaryngology. He estimated that he performed 200 to 250 submandibular salivary gland removal surgeries over his career. *See* N.T., 8/29/23, at 127. Preliminarily, he explained the following: there are four groups of salivary glands. "Most saliva comes from the second largest gland which is the submandibular gland which lies under our" jaw. *Id*. at 131-32. One nerve in this general area is the lingual nerve, which "tells us sensation of the front two-thirds of our tongue," including taste. *Id*. at 133, 134.

When the operation to remove the submandibular salivary gland starts, the lingual nerve "is not visible. It sits above and deep to the submandibular salivary gland." *Id*. at 140. Accessing the gland requires manipulation of several structures, including the mylohyoid muscle and submandibular ganglion, described as "like a train station that all these nerves go through and some branch[] off in different directions." *Id*. at 133, 134. "[I]n order to remove the salivary gland, you have to cut those branches." *Id*. at 134. Other nerves in this area are the hypoglossal nerve and chorda tympani fibers.

"[A] surgeon must identify, isolate, and protect the important structures that are in the operative field." *Id*. at 141.[4]

Turning to Simbeck's operation, Expert Witness testified to the following. Dr. Roscoe's post-surgery report "did not mention . . . some of the important structures," including the lingual nerve, chorda tympani, or hypoglossal nerve. N.T., 8/29/23, at 139-40. Expert Witness stated that a report "should include what one did to protect those structures that are nearby, what you did to take care of them." *Id*. Expert Witness expressed concern that Dr. Roscoe did not properly isolate the nerves, based on the lack of detail in the report: "[I]t certainly raises concerns if it isn't mentioned that it wasn't done or wasn't thought of." *Id*. at 143. Expert Witness testified that in his expert opinion, Dr. Roscoe damaged Simbeck's lingual nerve due to "a substandard performance of the removal of the right submandibular salivary gland . . . , namely because of the failure to preserve and protect the lingual and chorda tympani, but primarily the lingual nerve which provides sensation to the tongue." *Id*. at 146.

As to what specific negligent acts by Dr. Roscoe caused those injuries, however, Expert Witness "couldn't really say because the detail of [Dr. Roscoe's] operative report wasn't great," and could not say "specifically which

---

[4] Dr. Roscoe testified that to "isolate" a nerve meant to move "the nerve out of the operative field so that when [he is] instrumenting or dissecting, [he is] not hurting it." N.T., 8/29/23, at 95. Dr. Roscoe also described a nerve as "very thin" and "like dental floss." *Id*.

instrument" caused the injury. *Id*. at 147. Simbeck asked, "[C]ould hemoclips have caused this injury[?]" *Id*. at 148. He responded that hemoclips "***could have***," *if* it "crush[ed] the nerve and cut[] off its blood supply." *Id*. (emphasis added).

On cross-examination, Expert Witness conceded he did not discuss hemoclips in the first report, and instead his opinion was that Dr. Roscoe "did something to interrupt the function of the [lingual] nerve." *Id*. at 154.

With respect to Dr. Kim's post-surgery CT scan and report, Expert Witness agreed that Dr. Kim "did not recommend exploratory surgery because there was no definitive evidence that a hemoclip was the culprit causing the lingual nerve injury." N.T., 8/29/23, at 155-56. When asked whether he believed Dr. Kim was "wrong," Expert Witness responded:

> No. I think I would agree with him and subsequent individuals who said the same thing. I think, number one, ***I'm not even sure a hemoclip was the factor that injured it***. And number two, if it was, I don't think removing it that long after would make any improvement or difference, so I would agree with them.
>
> * * * *
>
> [Simbeck:] And in fact, ***you said in your second report that the evidence is not sufficient to determine the exact means by which [Simbeck's] lingual nerve was injured***, fair?
>
> A. I said that, yes.

*Id*. at 156 (emphases added).

Additionally, Simbeck called Dr. Roscoe as an adverse witness. He denied that he injured Simbeck's lingual nerve during surgery, stating that he

had already isolated the lingual nerve before using hemoclips. Nevertheless, he agreed that nerve damage is a major risk when surgically removing the salivary gland. *Id*. at 89-90. Generally, to avoid damaging nerves, a surgeon must isolate and move them away from the operative field so that the salivary gland can be safely removed. Dr. Roscoe testified that Simbeck's nerves and "tissues were not easily separated or segregated because of the chronicity and infection there. [Simbeck] had marked adhesions, marked scar tissue. So this was not a textbook dissection[.]" *Id*. at 98.

Dr. Roscoe moved to strike Expert Witness' testimony. Dr. Roscoe argued: (1) Simbeck's complaint made "a very specific claim of negligence, . . . that the hemoclip damaged the [lingual] nerve;" but (2) Expert Witness "readily admitted that he can't say with any certainty that it was a hemoclip that injured the nerve."[5] N.T., 8/29/23, at 186. In response to the trial court's

---

[5] Dr. Roscoe speculated that Simbeck may have wanted to argue a *res ipsa loquitur* claim, but argued she was "limited to the cause of action pled." N.T., 8/29/23, at 186. ***See also Fessenden v. Robert Packer Hosp.***, 97 A.3d 1225, 1230 (Pa. Super. 2014) (explaining that the doctrine of *res ipsa loquitur*: (1) provides an exception to the general "requirement that medical malpractice claims be supported by expert testimony," where there is "obvious negligence;" and (2) "allows a fact-finder to infer from the circumstances surrounding the injury that the harm suffered was caused by the negligence of the defendant"). In any event, Dr. Roscoe argued that a *res ipsa loquitur* claim would have been meritless, because Expert Witness had admitted Simbeck's injury could have occurred with or without negligence. ***See*** N.T., 8/29/23, at 193.

prompt,[6] Roscoe relied on the same argument to make a motion for nonsuit. However, the trial court did not rule on either.

Next, Simbeck testified at trial, first about her pre-surgery symptoms, including a lump in her throat, and then about her post-surgery swelling, pain, and problems with swallowing. Simbeck's husband, George, also testified.

On the morning of the second day of trial, Simbeck moved to amend her complaint to resolve any discrepancies between the initial complaint and Expert Witness' trial testimony.[7] **See** N.T., 8/30/23, at 19. The trial court denied this motion, finding the statute of limitations had passed and prohibited any new allegation of negligence.

Following Simbeck's case in chief, Dr. Roscoe moved, again, for nonsuit on the same grounds argued the day before. Dr. Roscoe averred that Simbeck had thus failed to sustain her burden of proof. In response, Simbeck raised the theory of increased risk of harm. When asked to clarify by the trial court, Simbeck argued that Dr. Roscoe's placement of "staples" on her lingual nerve was below the standard of care, and this act increased the risk of harm. **Id**.

---

[6] Following argument, the trial court stated: "I'm not going to rule on the motion [to strike Expert Witness' testimony] now. You're going to finish your case. You want to make a motion for what?" N.T., 8/29/23, at 195. Dr. Roscoe responded, "Nonsuit." **Id**. The trial court replied, "Okay. Make it then. . . . That will give me time to think." **Id**. at 195-96.

[7] At this time, Simbeck also requested to be recalled to the witness stand. The trial court denied this request. **See** N.T., 8/30/23, at 7.

at 17. The trial court agreed with Dr. Roscoe, granted his motion for nonsuit, and thus dismissed Simbeck's complaint.

Simbeck filed a timely post-trial motion, raising several arguments for a new trial. In February 2024, the trial court conducted a hearing. On June 10, 2024, the trial court denied Simbeck's post-trial motion.[8] Simbeck filed a notice of appeal.[9] Subsequently, upon Simbeck's praecipe for entry of judgment, the trial court entered judgment in favor of Dr. Roscoe.[10]

Simbeck presents three issues for our review:

[1]. Should [Dr. Roscoe's] motion to strike the testimony of [Expert Witness] be granted, when [Expert Witness] testified that it was his opinion that Dr. Roscoe's conduct created an increase in the risk of harm to . . . Simbeck and where . . . Simbeck suffered that harm?

[2]. Should [Simbeck's] motion to amend [her] complaint to conform the complaint to the evidence at trial pursuant to Pa.R.C.P. 1033 be granted when there was no prejudice to [Dr. Roscoe]?

---

[8] The text of the order states the date of June 5, 2025. However, both the "Filed" stamp on the face of the order and the corresponding trial docket entry state June 10, 2025.

[9] The trial docket does not indicate that the trial court directed Simbeck to file a Pa.R.A.P. 1925(b) statement of the reasons complained of on appeal.

[10] In her notice of appeal, Simbeck purported to appeal from the order denying her post-trial motion. However, "[s]uch orders are interlocutory and generally not appealable." *Prime Medica Assocs. v. Valley Forge Ins. Co.*, 970 A.2d 1149, 1154 n.6 (Pa. Super. 2009). This Court thus directed Simbeck to praecipe for final judgment, and she did so on August 20, 2024. The trial court entered final judgment that day. We deem Simbeck's notice of appeal [to be] timely.

[3]. Should [Dr. Roscoe's] motion *in limine* precluding [Expert Witness] from testifying that . . . Simbeck's oral pain was caused by . . . Dr. Roscoe's negligence be granted where such testimony was within the fair scope of the expert report authored by [Expert Witness]?

Simbeck's Brief at 6 (issues reordered for ease of disposition and unnecessary capitalization omitted).

In her first issue, Simbeck challenges the trial court's "grant[]" of Dr. Roscoe's motion to strike the testimony of Expert Witness. *Id*. at 22. We reiterate, however, that Dr. Roscoe presented the same argument in support of both his motion to strike the testimony and his motion for nonsuit. On appeal, Simbeck argues that the trial court erred in rejecting her theory of increased risk of harm. In light of the foregoing, we construe Simbeck's issue to be a challenge to the trial court's grant of a nonsuit.

We consider the applicable standard of review and relevant law. "In reviewing the entry of a nonsuit, our standard of review is well-established: we reverse only if, after giving [the] appellant the benefit of all reasonable inferences of fact, we find that the factfinder could not reasonably conclude that the essential elements of the cause of action were established." *Vicari v. Spiegel*, 936 A.2d 503, 509 (Pa. Super. 2007) (citation omitted). This Court has explained:

> A motion for compulsory non-suit allows a defendant to test the sufficiency of a plaintiff's evidence and may be entered only in cases where it is clear that the plaintiff has not [introduced sufficient evidence to establish the necessary elements to maintain a cause of action. I]n making this determination, the

- 10 -

plaintiff must be given the benefit of all reasonable inferences arising from the evidence.  . . .

**Gregury v. Greguras**, 196 A.3d 619, 625 (Pa. Super. 2018) (*en banc*) (citation omitted).

With respect to a medical malpractice action:

[T]o establish a prima facie case of malpractice, the plaintiff must establish (1) a duty owed by the physician to the patient (2) a breach of duty from the physician to the patient (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient, and (4) damages suffered by the patient that were a direct result of that harm.

**Vicari**, 936 A.2d at 509-10 (citation omitted).  Generally,

where the circumstances surrounding the malpractice claim are beyond the knowledge of the average layperson, . . . the plaintiff is . . . required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered[.]

**Id**. at 510 (citations omitted).

"However, certain cases make this an impossible standard.  These are the cases in which, irrespective of the quality of the medical treatment, a certain percentage of patients will suffer harm."  **Mitzelfelt v. Kamrin**, 584 A.2d at 888, 892 (Pa. 1990).

In such cases, where the plaintiff is unable to show to a reasonable degree of medical certainty that the physician's actions/omissions caused the resulting harm, but is able to show to a reasonable degree of medical certainty that the physician's actions/omissions *increased the risk of harm*, the question of whether the conduct caused the ultimate injury should be submitted to the jury.

***Billman v. Saylor***, 761 A.2d 1208, 1212 (Pa. Super. 2000) (emphasis added).

We summarize that the Pennsylvania Supreme Court endorsed the increased risk of harm theory in ***Hamil v. Bashline***, 392 A.2d 1280 (Pa. 1978). In that case, Kenneth Hamil's wife took him to a hospital emergency department due to severe chest pains. ***See id***. at 1283. An attending physician ordered an electrocardiogram ("EKG") test, but "the EKG machine failed to function." ***Id***. Hamil's wife then took him to a private doctor's office, where he died of a heart attack during the EKG test. ***Id***.

Hamil's widow sued, alleging that the hospital "failed to employ recognized and available methods of treating [Hamil's] malady, a myocardial infarction." ***Id***. at 1283. At trial, her expert witness opined that with the proper treatment, Hamil "would have had a 75% chance of surviving the [heart] attack he was experiencing when admitted to the hospital." ***Id***. The defendant hospital's expert witness "opined that death was imminent at the time of Hamil's arrival at the hospital and [he] would have died regardless of any treatment [the hospital] might have provided." ***Id***. Ultimately, the jury determined that the defendants acted negligently, but their negligence was not a proximate cause of Hamil's death. ***See id***. at 1283-84.

On appeal, the ***Hamil*** Court concluded the widow's expert witness' testimony "was sufficient to create a *prima facie* case of causation," and thus

- 12 -

the trial court properly submitted the issue of negligence to the jury. **Hamil**,

392 A.2d at 1289. The Court reasoned:

> Whereas typically a plaintiff alleges that a defendant's act or omission set in motion a force which resulted in harm, the theory of [an increased risk of harm] is that the defendant's act or omission failed in **a duty to protect against harm from another source**. To resolve such a claim a fact-finder must consider not only what **did** occur, but also what **might** have occurred, *i.e.*, **whether the harm would have resulted from the independent source** even if defendant had performed his service in a non-negligent manner. Such a determination as to what might have happened necessarily requires a weighing of probabilities.

*Id*. at 1286-87 (some emphases added and footnote omitted).[11]

Since **Hamil**, Pennsylvania decisions, which have affirmed the plaintiff's

theory of an increased risk of harm, have involved a medical professional's

failure to take reasonable steps that would have reduced the likelihood of

**other harm** ultimately suffered by the patient. **See**, **e.g.**, **Jones v.**

**Montefiore Hospital**, 431 A.2d at 925 (Pa. 1981) (holding plaintiff could

pursue increased risk of harm theory where doctor failed to treat a mass in

her breast, which was cancerous and ultimately spread to lymph node);

**Gradel v. Inouye**, 421 A.2d 674, 676-79 (Pa. 1980) (affirming jury verdict

in favor of child plaintiff, where defendant doctor's failure to diagnose lump

---

[11] Nevertheless, the **Hamil** Court found error in the trial court's jury instruction, that the defendants' "negligence had to be the **sole** cause of death in order to bring liability to the defendant when, in fact, liability could attach if the [defendants'] negligence . . . were but a substantial factor in bringing about the death." **Hamil**, 392 A.2d at 1289 (emphasis in original). The Court thus granted a new trial. **Id**. at 1290.

on boy's arm increased the risk of harm — that the undetected bone cancer would lead to amputation); **Klein v. Aronchick**, 85 A.3d 487, 496 (Pa. Super. 2014) (holding plaintiff presented sufficient evidence for submission of increased risk of harm theory to jury, where plaintiff's expert opined the defendant doctor's "negligence in over-prescribing Visicol [and] failing to monitor and follow-up [over] the years [the plaintiff] continued to ingest Visicol, at least increased the risk that she would develop chronic kidney disease"); **Vicari**, 936 A.2d at 511 (holding plaintiff presented sufficient evidence, including her expert's opinion that defendants' failure to refer plaintiff for chemotherapy increased her risk of metastasis, such that issue should have proceeded to a jury); **Mitzelfelt**, 584 A.2d at 893-94 (concluding plaintiff presented sufficient evidence from which jury could determine that defendant doctor failed to address significant drop in blood pressure during surgery, which led to patient's partial paralysis and confinement to wheelchair).

On appeal, Simbeck offers no rebuttal to Dr. Roscoe's underlying argument and the trial court's reasoning — that Expert Witness' expert report and trial testimony failed to support the allegation in her complaint — that Dr. Roscoe caused her injury by "insert[ing] an excessive amount of hemoclips [excessively] deep into the mylohyoid muscle[,] penetrating her lingual nerve." Complaint, 6/5/19, at ¶ 32(a)-(b). In other words, Simbeck makes

no claim that she proved direct causation through any specific negligent act by Dr. Roscoe.

Instead, in challenging the trial court's denial of post-trial motion relief, Simbeck argues solely that she presented sufficient evidence to support an increased risk of harm theory. She avers her case is similar to that of the plaintiff widow in **Hamil**:

> Dr. Roscoe's actions increased the risk of harm to . . . Simbeck. [Expert Witness] supported this theory of the case when he testified at trial, as in his expert reports, that . . . Dr. Roscoe's surgical maneuvers ultimately led to the injury to . . . Simbeck's lingual nerve. Thus, . . . Dr. Roscoe's actions "initiated a force leading to harm." **Hamil**, 392 A.2d at 1287.

> Despite [Dr. Roscoe's] argument that [Expert Witness] failed to testify with reasonable medical certainty regarding a breach of care, [Expert Witness'] testimony clearly supported [the claim that Dr. Roscoe] caused . . . Simbeck's injuries, or at the very least led to an increased risk of harm thereof [*sic*].

Simbeck's Brief at 24 (paragraph break added and citations to reproduced record omitted). Simbeck concludes the trial court improperly removed the question of causation from the jury.

In its opinion, the trial court recounted that Simbeck's increased risk of harm theory, first raised at trial in opposition to Dr. Roscoe's motion for nonsuit, "took the court somewhat by surprise." Trial Court Opinion, 6/10/24, at 5 (unnecessary capitalization omitted). In any event, the trial court focused on the language in **Hamil**, explaining a plaintiff invokes the theory of increased risk of harm when they allege "the defendant's act or omission failed

- 15 -

in a duty to protect against harm *from another source*." *Id*. at 18-19 (*quoting* *Hamil*, 392 A.2d at 1286) (emphasis in Trial Court Opinion). However, "[i]n the case at bar, there [was] no such other source of harm. [Dr.] Roscoe's actions or omissions [were] the only possible such source." *Id*. at 19.

After review of the record, giving Simbeck "the benefit of all reasonable inferences of fact," we hold the trial court properly found it "could not reasonably conclude that the essential elements of the cause of action were established." *Vicari*, 936 A.2d at 509. We agree with the trial court's clear discussion that in an increased risk of harm claim, the plaintiff alleges the defendant failed in a duty to protect against *harm from another, independent source*, and ultimately, the plaintiff suffered that harm from the other source. On appeal, Simbeck fails to acknowledge, let alone dispute, this reasoning by the trial court. She makes no claim that Dr. Roscoe failed in a duty to protect her "against harm from another source," nor that she ultimately suffered an injury from another source. Instead, she continues to insist her injury was a result of Dr. Roscoe's placement of hemoclips on her lingual nerve, which in turn "increased the risk of harm to" her. Simbeck's Brief at 24. This understanding of the increased risk of harm doctrine is mistaken. Accordingly, we agree with the trial court's rejection of Simbeck's increased risk of harm claim.

Moreover, we agree that the entry of a non-suit was appropriate for the reasons expressed by the trial court, and its reliance on *Griffin v University of Pittsburgh Medical Center–Braddock Hospital*, 950 A.2d 996 (Pa. Super. 2008). The trial court concluded that Expert Witness's testimony "failed to establish that any negligent act was committed by [Dr.] Roscoe which caused harm to [Simbeck's] lingual nerve, to the requisite 'reasonable degree of medical certainty.'" Trial Court Opinion, 6/10/24, at 11. The trial court thoroughly discussed Expert Witness's testimony but ultimately determined that Expert Witness never established how Dr. Roscoe was negligent, nor how the negligence caused an injury to Simbeck, especially regarding the allegations of negligence in the complaint. On appeal, Simbeck fails to persuade us that her expert sufficiently identified the standard of care that Dr. Roscoe breached and that this breach caused her injuries to a reasonable degree of medical certainty. Therefore, no relief is due on Simbeck's first issue.

In her second issue, Simbeck asserts the trial court erred in denying her motion to amend the complaint "to conform to the evidence presented at trial." Simbeck's Brief at 14. As stated above, the trial court denied this request on the grounds the statute of limitations had passed and thus prohibited any new claim. *See* N.T., 8/30/23, at 25; *see also* 42 Pa.C.S.A. § 5524(2) (requiring a negligence action to be commenced within two years); Trial Court Opinion, 6/10/24, at 4. Simbeck contends that although Expert

- 17 -

Witness' "reports did not precisely match the exact language of the complaint, nor [tracked] the expert's testimony at trial[,] the core of the allegation was there: do not injure the nerves during the procedure." Simbeck's Brief at 34. Simbeck reasons Dr. Roscoe was not "surprised by such minor variations in vernacular," and thus would not have suffered any prejudice. *Id*. Finally, Simbeck avers the Pennsylvania Rules of Civil Procedure should be liberally construed.

A careful review of Simbeck's argument reveals she fails to specify what her anticipated amendment to the complaint would have been. *See* Pa.R.A.P. 2119(a) (requiring argument to be "followed by such discussion and citation of authorities as are deemed pertinent"); *see also Kaur v. Singh*, 259 A.3d 505, 511 (Pa. Super. 2021) (stating that "[w]hen an appellant fails to properly raise and develop issues in briefs with arguments that are sufficiently developed for our review, we may dismiss the appeal or find certain issues waived"). In any event, Simbeck's argument does not relate to or affect our disposition of her increased risk of harm issue above. As we affirm the grant of nonsuit in favor of Dr. Roscoe, we determine no relief is due on Simbeck's second issue.

In her final issue, Simbeck challenges the trial court's evidentiary ruling, precluding Expert Witness from testifying that Dr. Roscoe caused Simbeck's oral pain. We note that in making this ruling, the trial court reasoned that such an opinion would have been

> beyond the scope of [Expert Witness'] expert report. The report only mentioned the numbness of Simbeck's tongue and its cause. The doctor's [testimony at a hearing on this evidentiary issue] revealed a different cause or mechanism for the pain, [a "dead" sensory nerve,] not mentioned in the report at all.

Trial Court Opinion, 6/10/24, at 20. Nevertheless, the trial court ruled that pain could be discussed in general terms, but Expert Witness could not link specific instances of pain beyond those identified in his report.

We determine no relief is due. Simbeck failed to make a *prima facie* case that Dr. Roscoe was negligent. Thus, whether the expert reports fairly addressed other types of pain or injuries was not relevant.

As we conclude Simbeck has not established any grounds for relief, we affirm the judgment entered in Dr. Roscoe's favor.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 8/6/2025