J-A13020-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MARVIN SMITH, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF TANYA SMITH, DECEASED | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : | |
| | : | No. 1084 MDA 2022 |
| ANNIE KANNARKATT, M.D., AND CANCER CARE ASSOCIATES OF YORK, INC. | : : : : | |

Appeal from the Order Entered July 6, 2022
In the Court of Common Pleas of York County Civil Division at No(s):
2018-SU-002317

BEFORE:   BOWES, J., LAZARUS, J., and STEVENS, P.J.E.*

MEMORANDUM BY LAZARUS, J.:          **FILED: MARCH 11, 2024**

Marvin Smith, individually and in his capacity as Administrator of the Estate of Tanya Smith, Deceased, appeals from the order, entered in the Court of Common Pleas of York County, denying his post-trial motion to remove a nonsuit and for a new trial. After our careful review, we vacate and remand for a new trial.

The trial court set forth the factual and procedural history of this matter as follows:

> In 2017 Plaintiffs' decedent, Tanya Smith [("Decedent")], presented with an enlarged lymph node[,] which had been discovered during treatment for shoulder pain she was experiencing. A biopsy of the lymph produced a sample, which[,]

_____

* Former Justice specially assigned to the Superior Court.

when tested[, led] to a diagnosis of stage 4 breast cancer[, although radiological testing revealed no primary tumor in the breast]. Upon this diagnosis, [Decedent] begin treating with Annie Kannarkatt[, M.D.,] at Cancer Care Associates of York, Inc.

[Doctor] Kannarkatt began a treatment regime which included chemotherapy and radiation therapy [appropriate to a diagnosis of breast cancer]. While the areas exposed to radiation therapy saw improvement, the chemotherapy produced little to no improvement. By 2018[,] the cancer had spread throughout [Decedent's] abdomen. In 2018[, Decedent] had her gall bladder removed, which contained cancerous tissue. This tissue was biopsied, which [led] to a revised diagnosis of an incredibly rare form of cancer known as ALK positive large B-cell lymphoma.

Upon receiving this new diagnosis, [Decedent] transferred her care to the Milton S. Hershey Medical Center. There, [Decedent] underwent a regime of chemotherapy directed to lymphoma[-]type cancers, which initially produced little[-]to[-]no response. [Decedent] then underwent "salvage" chemotherapy, which reduced her cancer load to the point of being able to undergo a stem cell transplant. In December of 2018[, Decedent] underwent a stem cell transplant. Unfortunately, she did not respond positively to the transplant, and she died January 6, 2019.

Prior to her death, in August of 2018[, Decedent] and her husband initiated the present action. During the course of this action[, Decedent's] estate was substituted after her death, and Plaintiffs undertook several amended pleadings. Relative to the instant post-trial motion, on February 26, 2021[,] attorneys for WellSpan, a formerly named defendant, filed a motion *in limine*, which, *inter alia*, sought to preclude reference to handwritten meeting notes from a tumor board meeting at which a then[-]unnamed and unidentified patient was discussed. This patient was later deduced to be [Decedent].

By order dated March 16, 2021[,] the court granted WellSpan's motion and precluded reference to the tumor board notes. Plaintiffs requested reconsideration, which the court granted. Prior to the scheduled start of trial on May 21, 2021, the court entertained oral argument on the matter, after which the court reissued its original order precluding testimony referenc[ing] the tumor board notes.

[T]rial was scheduled to commence on May 21, 2021[; however,] WellSpan requested a continuance . . ., as one of its expert

- 2 -

witnesses died unexpectedly the Friday evening before the Monday morning commencement of the trial. After this turn of events, Plaintiff and WellSpan agreed to mediate Plaintiffs' claims. That mediation effort proved successful, resulting in WellSpan being dismissed from the action and subsequent trials.

This matter was first tried before a jury beginning October 21, 2021[,] and concluding October 28, 2021[, at which time] the jury could not return a verdict. No error was claimed by either party at the time of the mistrial resulting from the hung jury. The matter was again scheduled for trial, which did in fact commence on April 25, 2022.

Plaintiffs rested on April 27, 2022, after which Defendants moved for an involuntary non-suit. After oral argument on Defendants' motion, the court granted the motion and entered judgment in favor of the Defendants. Plaintiffs timely filed [a] post[-]trial motion [seeking removal of the non-suit and a new trial. After briefing, the court denied the motion.]

Trial Court Opinion, 7/6/22, at 1-3 (unpaginated) (unnecessary capitalization omitted).

Smith filed a timely notice of appeal, followed by a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He raises the following claims for our review:

1. Whether the trial court erred and/or abused its discretion in granting non-suit and denying [Smith's] post-trial motion to remove nonsuit and for new trial, where:[1]

_____

[1] In their brief, Appellees argue that Smith has waived sub-issues 1.b through 1.d for failure to raise them in post-trial motions. We agree. Although Smith includes those claims in his Rule 1925(b) statement, "the filing of a [Rule] 1925(b) statement does not excuse the failure to file post-trial motions and does not revive or preserve issues that are waived for failure to file post-trial motions." *Diamond Reo Truck Co. v. Mid-Pac. Indus., Inc.*, 806 A.2d 423, 429 (Pa. Super. 2002). As Smith raised and argued only claims 1.a and 2 in his post-trial motion and brief in support thereof, the remainder of his claims are waived.

    a. [Smith] presented sufficient expert testimony of an increased risk of harm to the requisite degree of medical certainty;

    b. the trial court improperly relied upon Appellees' presentation of evidence which the court allowed to be presented out-of-turn during [Smith's] case-in-chief; and

    c. the trial court improperly failed to consider all evidence beneficial to [Smith]; and

    d. [Smith] presented sufficient lay witness and expert testimony to the requisite degree of medical certainty of factual cause.

2. Whether the trial court erred and/or abused its discretion when it ruled the Tumor Board meeting notes to be inadmissible hearsay and/or abused its discretion when it precluded any and all references to the notes, including for impeachment purposes.

Brief of Appellant, at 5-6 (rephrased for ease of disposition; unnecessary capitalization and footnotes omitted).

Smith first challenges the trial court's grant of—and refusal to remove—a nonsuit. In **Rolon v. Davies**, 232 A.3d 773 (Pa. Super. 2020), this Court reiterated the applicable standard of review as follows:

In reviewing the entry of a nonsuit, our standard of review is well-established: we reverse only if, after giving appellant the benefit of all reasonable inferences of fact, we find that the factfinder could not reasonably conclude that the essential elements of the cause of action were established. Indeed, when a nonsuit is entered, the lack of evidence to sustain the action must be so clear that it admits no room for fair and reasonable disagreement. The fact-finder, however, cannot be permitted to reach a decision on the basis of speculation or conjecture.

*Id.* at 776-77 (citation omitted). "The appellate court must review the evidence to determine whether the trial court abused its discretion or made

an error of law." ***Baird v. Smiley***, 169 A.3d 120, 124 (Pa. Super. 2017) (citation omitted).

> Medical malpractice is a form of negligence. ***Griffin v. University of Pittsburgh Med. Ctr.-Braddock Hosp.***, 950 A.2d 996, 999 (Pa. Super. 2008)[.] To make a *prima facie* case[,] a plaintiff must establish that the physician owed the plaintiff a duty and breached it; that the breach was the proximate cause of the plaintiff's harm; and that the alleged damages were a direct result of the harm. ***Id.*** at 999-1000 (quoting ***Quinby v. Plumsteadville Fam. Practice, Inc.***, [] 907 A.2d 1061, 1070-71 ([Pa.] 2006)). The plaintiff must present expert testimony "where the circumstances surrounding the malpractice claim are beyond the knowledge of the average layperson." ***Id.*** at 1000 (quoting ***Vogelsberger v. Magee-Womens Hosp. of UPMC Health Sys.***, 903 A.2d 540, 563 n.11 (Pa. Super. 2006)[.]
>
> An expert must testify, to a reasonable degree of medical certainty, that the defendant physician deviated from acceptable standards, and that the deviation was the proximate cause of the plaintiff's harm. ***Vicari***[ ***v. Spiegel***, 936 A.2d 503,] 510 [(Pa. Super. 2007)]. Further, "a medical opinion need only demonstrate, with a reasonable degree of medical certainty, that a defendant's conduct increased the risk of the harm actually sustained, and the jury then must decide whether that conduct was a substantial factor in bringing about the harm." ***Id.*** (quoting ***Smith v. Grab***, 705 A.2d 894, 899 (Pa. Super. 1997)).

***Rolon***, 232 A.3d at 777.

"[W]here the plaintiff is unable to show to a reasonable degree of medical certainty that the physician's actions/omissions caused the resulting harm, but is able to show to a reasonable degree of medical certainty that the physician's actions/omissions increased the risk of harm, the question of whether the conduct caused the ultimate injury should be submitted to the jury." ***Billman v. Saylor***, 761 A.2d 1208, 1212 (Pa. Super. 2000).

An example of this type of case is a failure of a physician to [make a timely diagnosis]. Although timely detection of a [disease or medical condition] may well reduce the likelihood that a patient will have a terminal [or adverse] result, even with timely detection and optimal treatment, a certain percentage of patients unfortunately will succumb to the disease. This statistical factor, however, does not preclude a plaintiff from prevailing in a lawsuit. Rather, once there is testimony that there was a failure to detect the cancer in a timely fashion, and such failure increased the risk that the [plaintiff] would have either a shortened life expectancy or suffered harm, then it is a question for the jury whether they believe, by a preponderance of the evidence, that the acts or omissions of the physician were a substantial factor in bringing about the harm.

*Id.* at 1212, quoting **Mitzelfelt v. Kamrin**, 584 A.2d 888, 892 (Pa. 1990).

"Where the events and circumstances of a malpractice action are beyond the knowledge of the average lay person, the plaintiff must present expert testimony that the acts of the medical practitioner deviated from good and acceptable medical standards, and that such deviation was a substantial factor in causing the harm suffered." **Cohen v. Albert Einstein Med. Center**, 592 A.2d 720, 723 (Pa. Super. 1991).

It is the plaintiff's burden to prove that the harm suffered was due to the conduct of the defendant. As in many other areas of the law, that burden must be sustained by a preponderance of the evidence. Whether in a particular case that standard has been met with respect to the element of causation is normally a question of fact for the jury; the question is to be removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue.

**Hamil v. Bashline**, 392 A.2d 1280, 1284–85 (Pa. 1978).

Smith first alleges that entry of nonsuit was improper where he presented sufficient expert testimony of an increased risk of harm to the requisite degree of medical certainty. Smith argues that the trial court

misunderstood Smith's burden and that, when reviewed in its entirety and giving Smith the benefit of all reasonable inferences of fact, the testimony proffered by Smith "sufficiently established that [Dr. Kannarkatt's] negligence increased the risk of harm to [Decedent] in accordance with Supreme Court precedents." Brief of Appellant, at 34. Specifically, Smith asserts that the testimony of his causation expert, Dr. Robert Soiffer, emphasized the importance of employing aggressive and appropriate chemotherapy treatment as early as possible, as bone marrow transplants—which can result in a cure— "work better the less [the] disease burden and at the earliest possibility." *Id.* at 35. Smith cites the following testimony of Dr. Soiffer:

> [Q:] So[,] what difference is there, if any, of [Decedent's] chances of having a prolonged life if this diagnosis had been made and those same treatments were given to her in 2017 instead of 2018?
>
> A: The difference between 2017 and 2018 was that the disease had spread considerably between 2017 and 2018. It was at a later stage. She had already received considerable amounts of chemotherapy.
>
> And in general, transplants performed in first remission yield far better results than transplants performed in subsequent remissions or when patients are in remission. So[,] the optimal time to proceed with aggressive therapy would have been earlier in her course.

N.T. Trial, 4/26/22, at 183.

Smith notes that Dr. Soiffer further testified about the adverse effects of a patient receiving inappropriate forms of chemotherapy:

> Q: [] Second, you had said about the passage of time. What happens to cancers the longer they go untreated?

A: Well, when cancers are untreated or inadequately treated, they can grow, they can become resistant to chemotherapy that they've received in the past, and they can mutate. So[,] the cells are constantly growing. They can develop new mutations that make them more and more difficult to treat. That is not uncommon in patients with different malignancies that there is what's called—the term that's used is called clonal progression. So that the tumor clones, progress[es] that is. It's actually called clonal evolution. It evolves to a more complicated state with more mutations that make it more resistant to chemotherapy.

*Id.* at 187.

Finally, Smith notes the following opinion expressed by Dr. Soiffer:

Q: [] Dr. Soiffer, do you have an opinion to a reasonable degree of medical certainty whether the 13-month delay in making the correct diagnosis and starting treatment for this aggressive lymphoma as you have already described, did that deprive [Decedent] of a substantially better opportunity for a longer life beyond when she died on January 6th, 2019?

. . .

A: I think it did because the patient was subjected to chemotherapy that was—did not address her malignancy.

And there are two aspects to that concern. The first is that she did not get adequate therapy for the malignancy during that interval, during that period of time. She received agents that were not designed to treat lymphoma but rather designed to treat breast cancer. So that allowed the lymphoma to grow and spread to the point where it became more difficult to treat her subsequently and to treat her successfully subsequently.

In addition, during that 12[-]month or approximately a year period of time, she was, of course, subjected to chemotherapy. And chemotherapy has its own series of side effects that can be debilitating for a patient, debilitating on the patient and weaken that patient unnecessarily.

Brief of Appellant, at 38-39, quoting N.T. Trial, 4/26/22, at 189-90.

Smith asserts that the foregoing testimony of Dr. Soiffer

established that Appellees' failure to treat [Decedent's] cancer properly and in a timely manner . . . exposed her to **direct** injury from improper chemotherapy for 13 months, allowed her cancer to grow and mutate and become resistive, and allowed the cancer to spread into her abdomen, thereby decreasing her chance for a better outcome and substantially decreasing her chance for a longer life. By admittedly failing to read Dr. Soiffer's testimony in its entirety before pronouncing judgment, the [t]rial [c]ourt completely missed the clarity and extent of [Dr.] Soiffer's opinion.

Brief of Appellant, at 39-40 (emphasis in original).

Smith asserts that Dr. Soiffer's testimony was corroborated by the testimony of Decedent's treating oncologist, Seema Naik, M.D.,[2] that, "had [Decedent] been treated [with the proper therapies] in March 2017, before her cancer became widespread Stage IV, [she] had a better chance of beating the cancer or at least prolonging her life." *Id.* at 42. Dr. Naik further testified that "the ultimate outcome could have been way better if we would have seen her at initial presentation." *Id.*, citing Deposition of Seema G. Naik, M.D., 3/18/21, at 48.

Appellees respond that Dr. Soiffer's causation evidence was speculative and incapable of sustaining Smith's burden of proof. Appellees argue that "[a]n expert fails [the] standard of certainty if he testifies that the alleged cause 'possibly' or 'could have' led to the result, that it 'could very properly account' for the result, or even that it was 'very highly probable' that it caused the result." Brief of Appellees, at 31, quoting *Montgomery v. South Phila. Medical Group*, 656 A.2d 1385, 1390 (Pa. Super. 1995). Appellees argue that the "substance and totality of [Dr. Soiffer's] testimony reveals speculative

_____

[2] Smith presented Dr. Naik's videotaped deposition testimony at trial.

and equivocal medical opinions insufficient to carry [Smith's] burden of proof." *Id.* at 32. Appellees assert that Dr. Soiffer has never treated ALK positive large B-cell lymphoma, of which only 150 cases have been reported. *See id.* Appellees argue that Decedent outlived all known statistical possibilities for her form of lymphoma, for which there is no established treatment regimen. Appellees cite Dr. Soiffer's testimony that "[t]here's not one specific regimen, but [we would utilize] one of those regimens *and hope that that patient achieves a remission.*" *Id.* at 34, quoting N.T. Trial, 4/26/22, at 203 (emphasis added by Appellees). Moreover, Appellees argue, Dr. Soiffer was unable to offer any opinion as to survivability:

> Q: So[,] you can't say with any degree of certainty that had ALK positive B-cell lymphoma treatment been provided at the outset, [Decedent's] course would have been any different. You can't say that with any certainty, can you?
>
> A: I don't know what her survival would have been. I certainly can't predict that and how she would have—her as an individual, responded to the drugs that would be used to treat ALK positive lymphoma.
>
> I do know that she did not have the opportunity, though, to see how she would respond. And basically . . . she went from having a possible chance at a long-term remission [to] making that possible opportunity impossible by not having the lymphoma-directed therapy up front.

Brief of Appellees, at 35, quoting N.T. Trial, 4/26/22, at 205 (cross-examination of Dr. Soiffer).

Relying on *Montgomery*, *supra*, Appellees argue that this testimony fails to meet even the relaxed "increased risk of harm" standard of causation under *Hamil*, *supra*. In *Montgomery*, the plaintiff filed suit alleging

negligence against a physician's assistant for failing to refer her to a physician after she complained of pain in her left breast, which was ultimately diagnosed as breast cancer. After reviewing the relevant case law on increased risk of harm, this Court analyzed the plaintiff's expert testimony as follows and concluded it did not meet the relaxed *Hamil* standard:

> In the instant case, there was evidence that the plaintiff had been examined by employees of the defendant and that the plaintiff had complained of pain in her left breast. There also was evidence that, despite this complaint, the plaintiff had not been referred to a physician. There was no evidence, however, of the presence of any lump or mass; and a mammogram showed no abnormality. Thus, there was no evidence that an examination by a physician would have disclosed anything more than was discovered by the physician's assistant. The time when the tumor could first have been detected does not appear. Was it detectable a year earlier or only a short time before it was discovered by Dr. Seidman? Although Dr. Karp testified that the failure to refer plaintiff to a physician fell below the standard of care required of a physician's assistant, he was either unable or unwilling to say that the risk of harm had been increased thereby. He said only that it was "very possible" that the failure to refer her to a physician "may have increased her chance of having a positive lymph node" when the cancer was eventually diagnosed and that it "may have increased her risk for requiring a mastectomy with chemotherapy." On cross-examination he said, "[H]ad the tumor been diagnosed one year earlier, it is indeed possible that if it were small enough, the breast could have been conserved and treated by lumpectomy/radiation therapy alone." All of this was speculative, he conceded, saying "one can only speculate as to had it been diagnosed earlier what its size may have been, since we don't know, nor will we ever know."

*Montgomery*, 656 A.2d 1392-93.

Appellees assert that Smith's entire argument is based on a mischaracterization of its actual claim against Dr. Kannarkatt. Specifically, Appellees argue that the cause of Decedent's injury is related solely to the

misdiagnosis of her cancer by the pathologist, Dr. Wright, and that Smith's claim against Dr. Kannarkatt—a medical oncologist—is based solely on Dr. Kannarkatt's alleged failure to communicate with Dr. Wright to challenge the pathology diagnosis. Appellees argue that "[Smith's] evidence only established a causal connection to the negligence of Dr. Wright, the pathologist, not Dr. Kannarkatt." Brief of Appellees, at 27.

Appellees cite our Supreme Court's decision in **Hamil**, **supra**, in which the Court adopted the increased risk of harm standard as set forth in section 323(a) of the Restatement (Second) of Torts, but confirmed that a plaintiff must still present "evidence that a defendant's negligent act or omission increased the risk of harm to a person in plaintiff's position, and that the harm was in fact sustained[.]" **Hamil**, 392 A.2d at 1286. Appellees argue that, in this case, Smith adduced no evidence to establish "that the harms alleged were related to the theory of negligence asserted against Dr. Kannarkatt[.]" Brief of Appellees, at 29. Appellees argue that Dr. Soiffer's causation testimony "fail[ed] to create the legally necessary nexus to [Smith's] 'failure to communicate' theory of negligence alleged against Dr. Kannarkatt[.]" **Id.** at 26. Moreover, Smith "did not present a pathology expert to connect the theories of liability, causation[,] and damages. Instead, the only pathologist to testify was Dr. Wright[,] who . . . confirmed that he was solely responsible for [Decedent's] misdiagnosis." **Id.** The Appellees assert that "[e]ven Dr. Wright was incapable of providing any certainty that any communication from Dr. Kannarkatt would have changed his pathologic diagnosis and,

consequently, the treatment regimen."[3] *Id.* at 27. Accordingly, "[p]ermitting [Smith's] claim to proceed to a jury would have violated the fundamental principles upon which [the Supreme Court in] *Hamil* based the increased risk of harm standard." *Id.*

In response, Smith cites the testimony of his standard of care expert, Dr. Goldklang, who testified that medical oncologists, such as Dr. Kannarkatt, "play an integral role in the diagnostic process, by corroborating the clinical and radiological findings with the pathology diagnosis, before determining the course of treatment." Reply Brief of Appellant, at 5. Smith argues:

> As Dr. Wright explained and Dr. Goldklang confirmed, the system for arriving at a patient's cancer diagnosis is metaphorically a three-legged stool, where the legs are represented respectively by the radiological findings, clinical findings, and pathology diagnosis. In the vast majority of cancer patients, the pathology diagnosis "syncs" with the radiological . . . and [] clinical findings and there is no reason for the medical oncologist to question the pathology diagnosis. However, when[, as here,] the pathology diagnosis does not correlate with the clinical and radiological

---

[3] Doctor Wright testified as follows:

> Q: If you had gotten a call [asking "are you sure this is not lymphoma as opposed to adenocarcinoma?"], would that be something that you would look into further from a pathology standpoint?

> A: I suppose I could. . . . [B]ut I don't know how that conversation would have gone, whether I would have dug my heels in and said, ["]I'm very confident because it looks so epithelial["] or whether, if I really heard urgency and concern in the voice, I might have said, ["O]kay, I'll show several other pathologists and maybe we can["]—it's hard to say.

N.T. Trial, 4/26/22, at 271-72.

findings, it is the medical oncologist's responsibility to communicate that inconsistency to the pathologist.[4] The medical oncologist's job is to make sure he/she is treating the correct malignancy with the right combination of chemicals. In fact, pathologists expect that when the other two legs of the diagnostic stool do not "sync" with the pathology diagnosis, the clinician (medical oncologist) will communicate the discrepancy and give the pathologist the opportunity to revisit the pathological analysis. Otherwise, the diagnostic system fails and there is no purpose to the diagnostic stool.

*Id.* at 5-6.

Smith argues that, at the time Dr. Wright made his pathological diagnosis, there had been no breast imaging, which, when performed, failed

---

[4] Specifically, Dr. Goldklang testified as follows:

A: [] If one has a diagnosis of a different pathology, in this case the pathology being adenocarcinoma, the doctor who is going to be treating the patient with significant chemicals and significant side effects needs to really ask the pathology group to take a deeper dive, saying based on the appearances of other information, the diagnosis that you made, meaning the pathologist, just doesn't seem to fit.

Q: Is there any harm in contacting pathology and asking them to take a deeper dive?

A: I think it's very important and both parties learn more by doing so.

. . .

Pathologists, as excellent doctors as they may be, are not infallible and they did not have additional information that may have had them look further and take a deeper dive into it if they were to have spoken with the treating oncologist.

N.T. Trial, 4/27/22, at 346-47, 350.

- 14 -

to confirm the existence of a primary breast tumor.[5]  *Id.* at 8.  Doctor Kannarkatt, however, had access to this post-diagnosis imaging[6] and was the only doctor in possession of all the radiological and clinical findings, as well as the pathology diagnosis.  Nevertheless, she failed to contact Dr. Wright to discuss the fact that his diagnosis did not fit with the radiological and clinical findings.  *Id.* at 9.  As a result, Smith argues, "[Decedent] lost the chance to have the pathologist find the correct diagnosis that matched her clinical and radiologic evidence."  *Id.* at 10.  Therefore, Smith asserts he established that Dr. Kannarkatt's conduct "contributed to the failure to identify the lymphoma and the misdiagnosis" and he proved "a sufficient nexus between the alleged misconduct and the damages incurred."  *Id.* at 12.  We agree.

Upon review of the record in this matter, we conclude that Smith adduced evidence sufficient to establish a *prima facie* case, under the reduced standard of certainty adopted by the Supreme Court in **Hamil**, that Dr. Kannarkatt's conduct increased the risk of harm to Decedent, and that the case should have been submitted to a jury.  The evidence demonstrated that the clinical and radiological findings were not consistent with the pathologist's diagnosis of metastatic breast cancer.  The evidence further showed that, at

---

[5] Doctor Goldklang testified that, "in order for adenocarcinoma to spread to the lymph nodes and bones in the shoulder of [Decedent]", in the "vast majority of cases" there is a primary site for that adenocarcinoma.  N.T. Trial, 4/27/22, at 346.  He further testified that a primary tumor would "rarely" be missed by a PET scan.  *Id.*

[6] The imaging included a CT scan of the chest, a diagnostic mammogram, a diagnostic ultrasound, and a PET scan.  *See* N.T. Trial, 4/27/22, at 344, 346.

the time Dr. Wright made his pathological diagnosis, there had been no breast imaging to determine the existence of a primary tumor. *See* N.T. Trial, 4/27/22, at 389. Radiological studies performed subsequent to the pathological diagnosis failed to confirm the diagnosis of breast cancer. *Id.* at 390. Doctor Goldklang testified that, as the treating medical oncologist who is "a very integral part of the process," *id.* at 343, it was Dr. Kannarkatt's obligation, "if things [didn't] fit the clinical picture, to speak directly to the other doctors involved in the case." *Id.* at 392. Doctor Goldklang testified:

> If one has a diagnosis of a different pathology, in this case the pathology being adenocarcinoma, the doctor who is going to be treating the patient with significant chemicals and significant side effects needs to really ask the pathology group to take a deeper dive, saying based on the appearances of other information, the diagnosis that you made, meaning the pathologist, just doesn't seem to fit.

*Id.* at 347. As a result of her failure to question the pathologist's diagnosis in light of conflicting clinical and radiological findings, Dr. Goldklang concluded that Dr. Kannarkatt "failed to meet the standard of care in evaluation and treatment of [Decedent]" based on "concerns [he had] about no communication with the pathologist who was rendering an opinion from the slides presented." *Id.* at 342.

In addition, the evidence also demonstrated that the incorrect diagnosis that went unchallenged by Dr. Kannarkatt resulted in Decedent undergoing approximately one year of debilitating chemotherapy with drugs that were inappropriate to her cancer. *See id.* at 417 (Smith testifying that, between March 2017 and March 2018, there was never a time Decedent was not

undergoing chemotherapy and the treatments resulted in her not being able to do "hardly . . . anything" anymore). Doctor Soiffer testified that, over that period, Decedent's cancer "spread considerably" and had advanced to a later stage. *Id.*, 4/26/22, at 183. As a result of receiving treatment that did not actually address her malignancy, Dr. Soiffer testified that Decedent was "deprive[d] . . . of a substantially better opportunity for a longer life." *Id.* at 189-90. Although, as Appellees correctly note, Dr. Soiffer could not opine with certainty what Decedent's likelihood of survival would have been, we conclude that, under *Hamil*, he was not required to. As the Supreme Court stated in that case:

> When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. **If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass.** The law does not in the existing circumstances require the plaintiff to show to a certainty that the patient would have lived had she been hospitalized and operated on promptly.

*Hamil*, 392 A.2d at 1288, quoting *Hicks v. United States*, 368 F.2d 626, 632 (4th Cir. 1966) (emphasis added).

Moreover, *Montgomery*, which Appellees analogize to the facts of this case, is distinguishable. In that case, the plaintiff's expert was "unwilling or unable" to state whether the plaintiff's risk of harm was increased where "there was no evidence that an examination by a physician would have

- 17 -

disclosed anything more than was discovered by the [defendant] physician's assistant." **Montgomery**, 656 A.2d at 1393. Here, however, Dr. Goldklang testified that Dr. Kannarkatt breached the standard of care by failing to question the pathologist's diagnosis in light of the clinical and radiological findings, and Dr. Soiffer's testimony provided a basis for a jury to find that Dr. Kannarkatt's failure resulted in a significant delay in proper treatment which substantially reduced Decedent's chance for a better outcome—an outcome that could have included complete remission after proper chemotherapy modalities and, thereafter, a total cure through a subsequent bone marrow transplant. **See** N.T. Trial, 4/26/22, at 180-81 (Doctor Soiffer testifying bone marrow transplants can provide cure for patients with Decedent's diagnosis, but "[t]he more disease the patient has going into a transplant or the later in their course they are when they undergo a transplant, the worse their outcome is going to be with a transplant").

Under the standard adopted by our Supreme Court in **Hamil**, "medical opinion need only demonstrate, with a reasonable degree of medical certainty, that a defendant's conduct increased the risk of the harm actually sustained, and **the jury then must decide whether that conduct was a substantial factor in bringing about the harm**." **Jones v. Montefiore Hosp.**, 431 A.2d 920, 924 (Pa. 1981) (emphasis added) (holding increased risk of harm instruction appropriate "whether or not the medical testimony as to causation was expressed in terms of certainty or probability"). The record in this matter supports a finding that Dr. Kannarkatt breached her duty of care by failing to

question Dr. Wright's pathological diagnosis in light of the incompatible clinical and radiological findings and, in doing so, increased Decedent's risk of harm by substantially delaying her ability to receive proper treatment, while simultaneously allowing the disease time to mutate and spread further throughout her body, which was, in turn, weakened by a year's worth of inappropriate breast cancer chemotherapy. As such, the trial court erred in refusing to allow the jury to make the determination as to whether Dr. Kannarkatt's conduct was a substantial factor in bringing about the harm that befell the Decedent. ***See id.***

Lastly, Smith claims that the trial court abused its discretion when it deemed notes from a "tumor board" meeting inadmissible and precluded all reference thereto at trial. Specifically, Decedent's case was presented at a multidisciplinary oncology conference, known colloquially as a "tumor board," on March 16, 2017. Generally, tumor boards offer an opportunity for clinicians who are treating a patient to present their case to a multidisciplinary group of physicians, including oncologists, surgical oncologists, radiologists, and pathologists, to "discuss unusual cases and get some consensus or make recommendations" regarding the patient's course of treatment. N.T. Trial, 4/27/22, at 377; ***see also id.*** at 372. The patient is not identified when her case is presented to a tumor board. ***See id.*** at 375-76. Rather, an anonymous "Patient Information Sheet" is distributed to the attendees, outlining the patient's diagnoses and past medical history. ***See*** Plaintiff's

Response to Omnibus Motion *in Limine* of Dr. Wright and Wellspan, 3/5/21, at Exhibit I.

In attendance at the March 16, 2017 tumor board meeting was Misty Stiffler, a certified tumor registrar ("CTR"), whose role at the meeting was to "take attendance and . . . take any notes." Deposition of Misty Stiffler, 6/11/19, at 9. As a CTR, Stiffler would not record everything that transpired at a tumor board meeting; rather, her notes were "just brief summaries, just jotting down as they're speaking." *Id.* at 13. The notes are "internal for the registrars only." *Id.* at 10.

In their omnibus motion *in limine*, defendants Wellspan and Dr. Wright sought to preclude Stiffler's notes as unreliable hearsay evidence and, in the alternative, if introduced, to preclude plaintiff from mischaracterizing the meaning of the notes. **See** Omnibus Motion *in Limine* of Dr. Wright and Wellspan, 2/26/21, at 12-17. Movants argued that the notes did not fall under any recognized exception to the hearsay rule because: (1) the declarants, i.e., the doctors present at the meeting, did not review, approve, or adopt them; (2) the notes are not medical records falling under the business records exception, **see** Pa.R.E. 803(6); and (3) they are not recorded recollections under Pa.R.E. 803.1(3), which recognizes an exception for "[a] memorandum or record made or adopted by a declarant-witness," as the witness—Stiffler— is not the declarant. **See** Omnibus Motion *in Limine* of Dr. Wright and Wellspan, 2/26/21, at ¶¶ 60-63. The trial court granted the motion and

precluded all reference to the tumor board notes at trial. *See* Trial Court Order, 3/17/21, at 2 (unpaginated).

Smith argues that the notes are relevant to impeach the testimony of witnesses who were present at the tumor board meeting and who all recalled that there had been agreement as to the correctness of Decedent's diagnosis of adenocarcinoma. Smith alleges that Stiffler's notes "clearly indicate that the pathology diagnosis was not definitive, and that the tumor board expressed a need for additional pathology stains to identify the tumor." Brief of Appellant, at 65. Smith asserts that the notes are admissible as both a recorded recollection under Rule 803.1(3) and a business record, pursuant to Rule 803(6).

Appellees respond that the tumor board notes: (1) are not relevant to any issue at trial; (2) constitute hearsay within hearsay; and (3) do not fall under any exception to the hearsay rule. With regard to relevancy, Appellees cite Smith's own motion *in limine*, in which he sought to preclude "evidence, argument and/or testimony concerning the York Hospital tumor board's discussion of, findings[,] and/or recommendation regarding [Decedent's case] at trial." Plaintiff's Omnibus Motion *in Limine*, 9/13/21, at 13 (unpaginated) (unnecessary capitalization omitted). In his motion *in limine*, Smith argued that any "testimony, evidence[,] and/or argument [related to the tumor board meeting] would be irrelevant, misleading, and unfairly prejudicial and should, therefore, be precluded." *Id.* Smith further stated:

[] Plaintiff will not be introducing evidence, argument[,] and/or testimony regarding the tumor board at trial. Information regarding the tumor board was relevant to Plaintiff's corporate negligence claim against York Hospital. That claim was resolved at the arbitration; hence, information about the tumor board is now irrelevant to the case.

*Id.* at 14 (unpaginated) (unnecessary capitalization omitted). Appellees argue that, based on the Smith's own representations, "the tumor board notes were irrelevant at trial in this matter, and never related to any claim asserted against Dr. Kannarkatt." Brief of Appellees, at 44 (unnecessary capitalization omitted). Accordingly, Appellees argue that the trial court properly excluded them.

We agree with Appellees that Smith's prior (and successful) advocacy before the trial court to exclude evidence related to the tumor board meeting precludes him from now arguing that the trial court erred **in doing exactly what Smith requested**. By order filed September 24, 2021, the court granted, in part, and denied, in part, Smith's motion *in limine* regarding tumor board evidence. In denying Smith's motion, in part, the court allowed the introduction of tumor board evidence only to the extent that "such information [] was actually communicated to Dr. Kannarkatt by someone with personal knowledge of the discussion of, finding[s,] and/or recommendation[s]" from the tumor board. Trial Court Order, 9/24/21, at 2 (unpaginated). In all other respects, the court granted Smith's motion, excluding "[a]ll other evidence, argument[,] and/or testimony regarding the [tumor board's] discussion of, findings[,] and/or recommendation regarding Decedent[.]" *Id.* Smith now

seeks a reversal of the very decision he advocated for in the trial court. This he may not do. This Court has declared that litigants "will not be permitted to 'blow hot and cold' by now taking a position [on appeal] inconsistent with that by which he previously induced the trial court to act[.]" ***Reese v. Reese***, 506 A.2d 471, 474 (Pa. Super. 1986). Accordingly, the trial court did not err in excluding the tumor board notes.

Judgment vacated. Case remanded for new trial. Jurisdiction relinquished.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 03/11/2024